# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | No. 10-131 |
| **NATHANIEL BENJAMIN** | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                                       **July 26, 2010**

During a September 19, 2008 search of Nathaniel Benjamin's residence at 534 East Marshall Street in Norristown, Pennsylvania, parole agents uncovered drugs and guns. Benjamin was on parole at the time of the search. The Government indicted Benjamin for possession with intent to distribute five grams or more of cocaine, possession with intent to distribute marijuana, and for being a felon in possession of a firearm. He has moved to suppress the physical evidence uncovered during the search as well as a statement he made to a parole officer about the location of a gun in his residence. On July 8, 2010, the Court held a suppression hearing. For the reasons below, the Court denies the motion to suppress the physical evidence but will grant the motion to suppress Benjamin's statement.

## I.    BACKGROUND

Parole Agent Harry Gaab was the only person to testify at the suppression hearing. He is a fifteen year veteran of the Pennsylvania Board of Probation and Parole and has been trained in a variety of law enforcement areas, including firearms and criminal behavior. As a parol agent, he has conducted several hundred searches and at any given time, supervises eight-five to one hundred parolees. The Court finds his testimony credible.

Upon Benjamin's release from prison after a state conviction for possession with intent to distribute a controlled substance, he was placed under the supervision of Agent Gaab. As a condition of his parole, Benjamin signed a standard parole form. He agreed to remain in the Chester District, which encompassed the Pennsylvania counties of Montgomery, Delaware, and Chester but did not include Philadelphia County, unless he received prior written permission from his supervisor; to maintain an approved residence at 534 East Marshall Street in Norristown with his fiancée, Stacy Esprit, unless he received prior permission to move; and to abstain from the unlawful possession or sale of illegal drugs. He also agreed to refrain from owning or possessing any firearms or other weapons; to abstain from consuming or possessing alcohol under any condition or for any reason; to refrain from operating a car without a valid Pennsylvania driver's license, proper registration, proof of insurance, and his supervising agent's permission; to refrain from associating with drug users or dealers; and to refrain from possessing a cell phone, pager, or drug paraphernalia. In exchange for being paroled, he expressly consented to warrantless searches of his person, property, and residence by agents of the Pennsylvania Board of Probation and Parole.

On September 4, 2008, Philadelphia Homicide Detective Gary White informed Gaab that Benjamin was a suspect in a drug-related killing that happened in the Frankford section of Philadelphia on August 28, 2008. Witnesses placed Benjamin at the scene shortly before the killing although Detective White did not believe that Benjamin pulled the trigger. Detective White told Gaab that Benjamin was associated with the shooting victim, Shaun Lowe, who was a drug dealer. White further informed Gaab that Benjamin was living in Philadelphia and was driving a white Chevrolet Impala and had a gray Nissan. Benjamin denied any involvement in the shooting when he was questioned by homicide detectives.

Following the call, Gaab went to Benjamin's approved residence at 534 East Marshall Street in Norristown where he saw a white Chevrolet Impala parked just outside the house. Gaab took down the tag and ran it through the PennDOT system. He learned that the vehicle was registered to a "James Burch" at the East Marshall Street address. Gaab then searched for the name "James Burch" in the PennDOT system and a picture of Benjamin appeared. At that time, Benjamin did not have permission to drive nor did Gaab authorize him to have a driver's license. In the summer of 2008, however, Benjamin had permission to work at a cell phone retail store in Philadelphia.

On September 4, 2008, Benjamin made an unexpected visit to Gaab's office. Gaab asked Benjamin if he recently had any contact with police, and Benjamin said that he had not. Meanwhile, another parole agent saw the white Chevrolet Impala registered to James Burch in the parking lot of the parole office; the vehicle had several empty beer cans inside. Another agent saw Benjamin in the car. An agent also saw a gray Nissan Altima near Benjamin's home on September 4, 2008. Agent Gaab saw this same vehicle near the home the next day. Benjamin was never seen driving this car.

Prior to Detective White's call, but while he was still on parole, Benjamin had been seen with numerous vehicles. For example, in December of 2007, Benjamin was seen exiting a gray Camaro registered to James Burch. A navy blue Crown Victoria registered to James Burch was also seen parked next to Defendant's residence though he was never seen operating the vehicle or even around it. In May of 2008, Benjamin was seen working on an older model SUV or minivan registered to James Burch. Benjamin reported to Gaab that that particular vehicle belonged to his wife, which Gaab understood to mean it was Esprit's car. In August of 2008, Benjamin was seen working on a beige Lexus registered to James Burch, though he was never seen driving the car. At some point,

3

Gaab also saw Benjamin using a cell phone.

On or about September 15, 2008, Gaab received his supervisor's permission to search Benjamin's residence and cars for evidence of parole violations. On September 19, 2008, six agents, including Gaab, and two supervisors from the Pennsylvania Board of Probation and Parole searched Benjamin's residence at 534 East Marshall Street in Norristown. Gaab knocked loudly on the front door a few times but nobody answered. He proceeded to the rear of the house where he heard a man and a woman whispering inside. Gaab knocked on the back door and eventually Stacy Esprit opened the door. Benjamin was in the kitchen area, which was in the back of the house. Benjamin was handcuffed and though Esprit was not handcuffed, several agents remained with her at all times while the residence was secured.

During the search, one agent found a black bag underneath the bed. The bag contained pistol targets, as well as eye and ear protections for a pistol range. Inside a shoe box located upstairs, Gaab located a shoe box that contained a gun box. There was no gun inside however and so Gaab returned downstairs. Gaab asked Benjamin who James Burch was and Esprit retrieved the keys to a number of vehicles so they could be searched. Gaab took Benjamin to the front porch and he asked Benjamin for the location of the gun. Benjamin initially denied having a gun, but when Gaab asked him again, he admitted that Esprit must have moved it from the dining room table just prior to the search. Esprit then took agents downstairs and showed them the location of the gun. The search of the home uncovered approximately 6.62 grams of crack, approximately 326.93 grams of marijuana, rubber gloves, plastic baggies, a digital scale, a loaded 9mm pistol, 9mm ammunition, and evidence that Benjamin had been to a firing range. Agents also found identification in the name of both James Burch and Nathaniel Benjamin, as well as multiple car titles and registrations and mail in the name

4

of both James Burch and Nathaniel Benjamin. The three vehicles registered to Burch were also found near the Norristown address. The search of the vehicles uncovered some empty alcohol cans and some cell phone boxes but nothing that Gaab considered to be contraband.

**II.    STANDARD OF REVIEW**

The movant bears the burden of proving, by a preponderance of the evidence, that the evidence in question should be suppressed. *United States v. Johnson,* 63 F.3d 242, 245 (3d Cir. 1995) (citing *United States v. Acosta,* 965 F.2d 1248, 1256 n.9 (3d Cir. 1992)). Once the defendant establishes that the police conducted a warrantless search, however, the burden shifts to the government to show that the search was reasonable. *Id*.

**III.   DISCUSSION**

**A.    The Search**

The Fourth Amendment to the United States Constitution protects the right of the people "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." Although a search of one's home ordinarily requires a warrant supported by probable cause, the Supreme Court has recognized exceptions when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Griffin v. Wisconsin*, 483 U.S 868, 873 (1987). In *Griffin*, the Supreme Court held that a state's operation of a probation system presents a "special need" that may excuse the customary warrant and probable cause requirements of the Fourth Amendment. *Id*. at 873-74. A warrant requirement would interfere with a state's probation system by allowing a magistrate, rather than a probation officer, to determine

the degree of supervision required for a probationer. *Id*. at 876. Additionally, probation officials could not respond as quickly to evidence of parole violations if they were required to obtain a warrant; thus, the deterrent effect of expeditious searches would be greatly reduced. *Id*. Thus, in cases involving drugs and illegal weapons, the Constitution does not bar a probation officer from acting upon a "lesser degree of certainty than the Fourth Amendment would otherwise require in order to intervene before a probationer does harm to himself or society." *Id*. at 879. Furthermore, a probation officer may rely on information provided by a police officer, whether or not it is based on firsthand knowledge. *Id*. at 879-80.

In *United States v. Knights*, 534 U.S. 112 (2001), the Supreme Court considered the reasonableness of the search of a probationer's apartment, without a warrant, pursuant to an agreement the defendant signed that permitted probation officers to search his residence at any time and without reasonable cause. The Court, examining the totality of the circumstances, held that the search was reasonable "with the probation search condition being a salient circumstance." *Id*. at 118. As a probationer, Knights could be required to submit to reasonable conditions that deprived him of certain rights enjoyed by law-abiding citizens. *Id*. at 119. The probation condition furthered the goals of protecting society from further crime and rehabilitating Knights, the condition was clearly expressed to Knights, and it significantly diminished his expectation of privacy. *Id*. at 119-20. Accordingly, the Court concluded that reasonable suspicion – which undoubtedly existed – was all that was required to justify the intrusion into Knights's apartment. *Id*. at 121-22.

The reasoning in *Griffin* applies to the parole system. *See United States v. Hill*, 967 F.2d 902, 909 (3d Cir. 1992). Indeed, "parole may be an even more severe restriction on liberty because the parolee has already been adjudged in need of incarceration." *Id*. (citing *United States v.*

*Cardona*, 903 F.2d 60, 63 (1st Cir. 1990)). In a constitutional analysis, there is no difference between probation and parole. *Id*. (citing *United States v. Harper*, 928 F.2d 894, 896 n.1 (9th Cir. 1991)).

Recently, the Supreme Court upheld a California state law that required parolees to consent to warrantless, suspicionless searches.[1] *Samson v. California*, 547 U.S. 843, 846 (2006). The Court reaffirmed the principle that probationers and parolees, by virtue of their status as such, lack the same expectation of liberty and freedoms as law-abiding citizens. *Id*. at 848-49 (citations omitted). Furthermore, the Court noted that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." *Id*. at 850. Samson's conditions of parole were clearly expressed to him and he assented to those conditions – including warrantless searches lacking any degree of suspicion – as a condition of his parole. *Id*. at 852. While Samson lacked a legitimate expectation of privacy, California demonstrated a number of substantial interests in supervising parolees, including reducing recidivism and promoting reintegration and positive citizenship. *Id*. at 853.

The law of Pennsylvania, however, differs from that of California. "Pennsylvania may empower a parole officer to conduct a warrantless search of a parolee's property based on reasonable suspicion that the parolee has violated a condition of parole." *United States v. Strickland*, 237 F. App'x 773, 777 (3d Cir. 2007) (citing *United States v. Baker*, 221 F.3d 438, 443-45 (3d Cir. 2007)); *United States v. Miller*, Crim. A. No. 04-636, 2005 WL 758246, at *2 (E.D. Pa. Apr. 1, 2005) ("[T]he law is very clear that parole officers may conduct warrantless searches of parolees and their

---

[1] The Court's decision was based on general Fourth Amendment principles and explicitly declined to determine whether the search was valid as a consent search or based on the "special needs" exception found in *Griffin*. *Id*. at 852 n.3.

residences based on no more than reasonable suspicion of parole violations."). A search of a parolee's person may be conducted by a parole officer if "there is a reasonable suspicion to believe that the offender possesses contraband or other evidence of violations of the conditions of supervision." 42 PA. CONS. STAT. ANN. § 9912(d)(1)(i). An officer may conduct a search of a parolee's residence or vehicle if "there is reasonable suspicion to believe that the real or other property in the possession of or under the control of the offender contains contraband or other evidence of violations of the conditions of supervision." *Id*. § 9912(d)(2). A supervisor must approve a property search absent exigent circumstances but need not approve a personal search. *Id*. § 9912(d)(3). Reasonable suspicion is determined from the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). "[T]he likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Id*. at 274. An officer may take into account a number of factors when deciding if reasonable suspicion exists, including: (1) the observations of the officers; (2) information provided by others; (3) the activities of the offender; (4) information provided by the offender; (5) the experience of the officers with the offender; (6) the experience of the officers in similar situations; (7) the prior criminal and supervisory histories of the offender; (8) the need to verify compliance with the conditions of supervision. *Id*. § 9912(d)(6)(i-viii). In assessing the reasonableness of a search, a court must balance "on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Knights*, 534 U.S. at 119. The defendant's status as a parolee factors into both sides of the equation. *See id*.

      Defendant argues that Gaab lacked reasonable suspicion for the search. He points out that

although he was a friend of the shooting victim, he has consistently denied involvement in the shooting. Benjamin has also not been charged in the shooting. He further denies maintaining an address in Philadelphia and disputes that he drove the gray Nissan, claiming it was only his fiancée who drove that car. He also admits only to working under the hood of the Lexus. Defendant also points out that he never failed a drug test while on parole, maintained employment and never failed to report when so required. With respect to the use of a cell phone, Defendant contends that Gaab authorized his cell phone usage and points out that he provided Gaab with a cell phone number where he could be contacted while at his pre-approved work, which happened to be a cell phone store.

Agent Gaab had reasonable suspicion to search Benjamin's home and cars. Gaab had information that Benjamin was at the Philadelphia murder scene of a drug-related killing when one of his friends was shot and murdered. Benjamin did not have permission to be in Philadelphia at the time of the shooting. Defendant also lied to Gaab when asked whether he had any contact with the police. Gaab further had information that Benjamin used an alias to fraudulently register numerous vehicles. Gaab testified that his experience was that drug dealers often change vehicles and register their cars in other people's names. The totality of the circumstances warrants a finding of reasonable suspicion. Furthermore, the fact that Benjamin complied with some of his parole conditions does not foreclose a finding that agents had reasonable suspicion that he violated other conditions. Given the factors set forth by Pennsylvania law when deciding if reasonable suspicion exists and examining the totality of the circumstances, the Court concludes that reasonable suspicion existed.

Defendant suggests that, assuming *arguendo*, reasonable suspicion existed that he violated parole, it was only for using unauthorized vehicles and such a violation would not extend reasonable

9

suspicion to permit a search of his residence. This is wrong. If Gaab had reasonable suspicion Benjamin was driving vehicles without permission, he surely had reasonable suspicion that evidence related to registration and ownership might be found in Benjamin's home. Furthermore, as discussed earlier, Agent Gaab had reasonable suspicion that Benjamin's parole violations went beyond the use of unauthorized vehicles, and thus a more expansive search of his home was permissible, since it was reasonable to suspect that the home contained evidence of those violations.

  **B. Miranda**

  The Fifth Amendment to the United States Constitution protects against self-incrimination: "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." A person must be informed of their *Miranda* rights, including the right to remain silent, if a custodial interrogation occurs. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The Government concedes both that the situation Benjamin was subject to was a custodial interrogation and that he was not read his *Miranda* rights. Rather, the Government contends that the "public safety" exception, articulated by the Supreme Court in *New York v. Quarles*, 467 U.S. 649 (1984), applies. In *Quarles*, the Supreme Court recognized a narrow exception to *Miranda* for those situations in which "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Id*. at 657. The Supreme Court refused to place police officers in a situation requiring them to decide, often in a matter of seconds, whether to ask the necessary questions without providing *Miranda* warnings and render inadmissible any probative answers, or give the proper warnings to preserve the evidence but risk destroying their ability to obtain the evidence and neutralize the threat posed. *Id*. at 657-58. The exception is applied using an objective test and thus the subjective motivation of the officer does not

control a court's analysis. *Id.* at 656, 659 n.8 (noting that courts should focus on whether the situation presented an "objectively reasonable need to protect the police or the public from any immediate danger"). Because the public safety exception does not extend to questions posed only to elicit testimonial evidence from the defendant, the question must have a rational relationship to defusing the perceived danger. *United States v. Newton*, 369 F.3d 659, 679 n.8 (2d Cir. 2004).

"The public safety exception requires examination of the totality of the circumstances." *United States v. Duncan*, 308 F. App'x 601, 605 (3d Cir. 2009). The Court recognizes that Agent Gaab and his fellow agents were faced with what could have escalated into a dangerous situation. Anytime law enforcement officers are required to conduct a search, particularly when a weapon may be found, officers place their safety and lives at risk. And the fact that Benjamin was handcuffed at the time he was questioned does not necessarily preclude applying the public safety exception. *See Newton*, 369 F.3d at 678. But the public safety exception cannot apply every time a weapon may be found during the search. The *Quarles* public safety exception is a narrow one and if it extended to the circumstances here, it could swallow the rule in *Miranda*, whenever police suspect the presence of a weapon.

At the hearing, Gaab's testimony made clear that agents neutralized any threat Benjamin, who was handcuffed, posed to them. As for Esprit, she was guarded by multiple agents during the search and she therefore posed a minimal threat to the agents. Despite Gaab's belief that Benjamin and Esprit may have hidden a weapon during the brief interlude before the agents gained entry to the home, the residence and persons inside were secure at the time Gaab asked Benjamin about the gun. Additionally, the purported shooting occurred weeks prior to the search and there was no reason to believe the situation would escalate due to hostilities inside the home. *Cf. id.* (applying exception

because occupants of apartment were hostile to each other and officers reasonably feared hostilities turning against them). Indeed, the search here occurred four days after Gaab received permission from his supervisor to search Benjamin's home and vehicles. Finally, prior to twice asking Benjamin for the location of the gun, he had asked him about James Burch. *Cf. Duncan*, 308 F. App'x at 606 (finding exception applicable, in part, because officer asked only one question "clearly for reasons of safety"). The failure to provide Benjamin his *Miranda* warnings was improper and his statements regarding the gun must therefore be suppressed.[2]

## IV.    CONCLUSION

Reasonable suspicion existed to search Benjamin's home and vehicles. The *Quarles* exception does not apply. Thus, the physical evidence may be introduced at trial but the statement is excluded. An appropriate Order will be docketed separately.

---

[2] The *Miranda* violation does not render inadmissible any of the physical evidence found during the search. The fruit-of-the-poisonous-tree doctrine does not apply to derivative evidence obtained as a result of a non-*Mirandized* statement. *United States v. Massenberg*, 45 F. App'x 115, 121 (3d Cir. 2002) (citing *United States v. DeSumma*, 272 F.3D 176, 180-81 (3d Cir. 2001)). Additionally, because reasonable suspicion existed for agents to search the home and vehicles, any gun in the home would have inevitably been discovered and is therefore not subject to suppression. *See Nix v. Williams*, 467 U.S. 431, 448 (1984).