# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | : | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | No. 10-131 |
| NATHANIEL BENJAMIN | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                                         July 5, 2011

     A jury convicted Nathaniel Benjamin of possession with intent to distribute five or more grams of crack, possession with intent to distribute marijuana for remuneration, and two counts of being a felon in possession of a firearm. Presently before the Court is Benjamin's post-trial motion for acquittal or, in the alternative, for a new trial. Benjamin also asks this Court to arrest judgment under Federal Rule of Criminal Procedure 34. Defendant contends, inter alia, that the Government failed to prove that he constructively possessed the drugs and gun found in the home where he lived with his fiancee. The motion is denied.

## I.    BACKGROUND

### A.    The Search of Benjamin's Residence

     Agent Harry Gaab of the Pennsylvania Board of Probation and Parole, who has been a parole officer for fifteen years, supervised Benjamin. (Mar. 7, 2011 Trial Tr. at 23-25.) Gaab approved Benjamin's residence at 534 East Marshall Street in Norristown, Pennsylvania, where Benjamin lived with his fiancee Stacy Esprit. (*Id*. at 25-27.) During the course of his supervision, Agent Gaab learned that Benjamin was driving despite not having a valid license. (*Id*. at 29.) Agent Gaab was able to associate several vehicles with Benjamin; Agent Gaab learned that the tags for the vehicles

listed 534 East Marshall Street as the address but were under the name James Burch, a name with which Agent Gaab was unfamiliar. (*Id*. at 30.) Agent Gaab's investigation revealed that Benjamin was using the name James Burch and he decided to perform a search of Benjamin's residence. (*Id*. at 31-32.)

On the morning of September 19, 2008, Agent Gaab led a team that searched 534 East Marshall Street. (*Id*. at 33-34.) After knocking on the door failed to elicit a response, Agent Gaab walked around to the side of the house. (*Id*. at 34.) He heard a male voice and a female voice, proceeded to the back of the house, and knocked again. (*Id*.) This time, Esprit let Agent Gaab in. (*Id*.) Benjamin was standing in the living room and complied with Agent Gaab's order to go into the living room and sit down. (*Id*. at 35.) Benjamin was then handcuffed as the rest of the team entered and secured the home. (*Id*.)

The search uncovered numerous items. In the master bedroom, agents found a shoe box on the right side foot of the bed with an empty plastic box for a Kel-Tec firearm. A black carry bag next to the shoe box contained hearing and eye protection, a stack of pistol targets from the shooting range Target World, shooting instructions, and two receipts from Target World, one for ammunition and a 9mm handgun and the other for hearing protection, and a postcard filled out by Benjamin listing his name and address, and a trigger lock. (*Id*. at 39-42.) Agent Gaab testified that agents took all of the items out of the black bag because they were still searching for a gun at the time. (*Id*. at 72-73.)

On a shelf in a closet in the master bedroom, along with maxi pads and a woman's gold purse, agents found a box of 9mm ammunition. (*Id*. at 43, 75.) They also found a receipt from Guns N' Things, a gun shop in Pennsylvania, for the purchase of a Kel-Tec firearm, as well as an

2

application for record of sale for the handgun. (*Id*. at 45.) The receipt had Esprit's name and address on it and the application for record of sale was signed by Esprit. (*Id*.) A large manilla envelope was also found next to Benjamin's bed, on the right side, containing paperwork that contained both Benjamin's name and the address of 534 East Marshall Street, and car titles with the name James Burch and the address of 534 East Marshall Street. (*Id*. at 45-47.) The manilla envelope also included a small notebook and a scrap piece of paper with dollar amounts listed on it. (*Id*. at 47.) The notebook included references to a '95 Cadillac STS head gasket, a '98 Bonneville needing a motor, and "a number of notations that appear to apply to cars." (*Id*. at 81-83.) Agents also found a Chefmate scale inside of its box to the right of the bed, near some women's and men's shoes. (*Id*. at 48, 78.)

The basement is a separate room in the house; the basement door has separate access directly to the outside. (*Id*. at 65.) The search of the basement uncovered "numerous car keys and house keys all on one key ring." (*Id*. at 49.) Esprit also lifted up a blanket, which had a black bag underneath it; the black bag contained a loaded Kel-Tec 9mm handgun. (*Id*. at 49-50.) The serial number on the gun matched the serial number listed on the plastic case found in the bedroom. (*Id*. at 50.) The keys discovered in the basement unlocked a gray Nissan Altima and a gold Lexus. (*Id*. at 52.) There was a pit bull caged in the basement. (*Id*. at 53.) The basement also had car stereo equipment, car tires, and car rims stacked by the back door. (*Id*. at 53-54, 90.) The basement ceiling was unfinished. (*Id*. at 54.) Near the back door was a piece of paneling nailed to the joist. Agent Gaab climbed on top of one of the small stereo blocks, reached up, and saw a white plastic bag and a brown paper bag. (*Id*.) The white plastic bag had a yellow bag inside of it. The yellow bag contained Ziploc bags of marijuana. (*Id*.) The brown paper bag had a white plastic bag inside of it.

3

(*Id*.) The white plastic bag contained more bags of marijuana. (*Id*.) A small bag of crack cocaine was right behind the brown paper bag in the rafters. (*Id*. at 54, 96-97.) There was also an open box of sandwich baggies in the basement. (*Id*. at 54-55.) In the kitchen, agents found an open box of blue nitrile gloves on the windowsill, as well as mail addressed to Benjamin using both his real name and his alias. (*Id*. at 58, 100.) Finally, agents discovered latex and nitrile gloves and a spoon in a Chevy Impala parked outside the house. (*Id*. at 60.) Agents also located Benjamin's wallet, which contained a driver's license for James Burch. (*Id*. at 61.) Agent Gaab contacted Detective Mike Lebby of the Montgomery County Detective Bureau and turned over the evidence to him. (*Id*.)

Detective Lebby sent a number of pieces of evidence to a lab for analysis but did not submit the Chefmate scale, the spoon, or the gloves found in Benjamin's car for a chemical analysis to determine if either product contained drug residue. (Mar. 8, 2011 Trial Tr. at 23, 28-30.) Detective Lebby also did not submit the plastic bags for fingerprint analysis. (*Id*. at 26-28.)

**B.    Testimony**

*1.    Gun purchase and Target World outing*

On September 13, 2008, Stacy Esprit bought a gun from Guns N' Things in Penndel, Pennsylvania. (*Id*. at 53, 56, 123.) Angel Miller was working at the gun shop when Esprit came in to fill out the paperwork and pick up the gun she bought. (*Id*. at 56.) According to the paperwork, Esprit was the buyer of the gun. (*Id*. at 59, 123-24.) She also provided her address, social security information, and birth date, and answered questions about whether she had been convicted of a crime and whether the gun was solely for her use. (*Id*. at 59-60, 66.) Benjamin was with Esprit at Guns N' Things. (*Id*. at 61-63.) Benjamin and Esprit talked about the gun and discussed the type of holster Esprit might want. (*Id*. at 62, 64.)

4

Peter Moss was a range master working at Target World on September 14, 2008 when a man and a woman, later identified as Benjamin and Esprit, entered the range. (*Id*. at 71.) Esprit said she was a first-time shooter and was given a safety lesson before she was permitted to fire the weapon. (*Id*. at 71-72.) Esprit filled out paperwork indicating that it was legal for her to own and possess a gun. (*Id*. at 73.) Before one could enter the range, he or she was required to show a state driver's license. (*Id*. at 75.) Moss testified that Benjamin filled out paperwork using the name James Burch and the address of 534 East Marshall Street, and indicating that he would be firing a Kel-Tec 9mm handgun at the range, although he did not see who wrote down the information contained on the range forms. (*Id*. at 76-77, 84.) Moss saw Benjamin fire the Kel-Tec 9mm handgun at Target World on September 14, 2008. (*Id*. at 79.)

Jason Jackson was also working at the Target World on September 14, 2008 and interacted with Benjamin and Esprit on the range. (*Id*. at 90-92.) Jackson saw Benjamin fill out paperwork that asked whether he could legally possess a gun. (*Id*. at 93.) He also saw Benjamin fire a Kel-Tec 9mm handgun at the range. (*Id*. at 94.)

   2. *Stacy Esprit*

Stacy Esprit lived at 534 East Marshall Street with Benjamin and her four children, aged ten, twelve, fifteen, and seventeen at the time of events, and her seven-week-old granddaughter. (*Id*. at 104-05.) She testified that she bought a gun on September 13, 2008. (*Id*. at 107.) She purchased the gun for protection from her ex-husband who had tried to kill her and was soon leaving jail, and she sought a weapon small enough for her to carry at all times. (*Id*. at 108-110, 121.) According to Esprit, Benjamin preferred a different brand from the handgun that she bought. (*Id*. at 109.) The day after she bought the gun, she went to the target range with Benjamin because she had never fired a

5

gun and wanted to become comfortable with the weapon. (*Id*. at 110-11.) Benjamin, who Esprit knew had experience with guns, was going to show her how to use the handgun. (*Id*. at 111-12.) Both Esprit and Benjamin fired guns while at the range. (*Id*. at 113.) She knew that Benjamin could not be near a gun because of his status as a parolee. (*Id*. at 156.)

On the day of the search of her home, Esprit was in the basement folding clothes with her gun next to her in her fanny pouch. (*Id*. at 114, 121.) As she was taking the clothes upstairs, Benjamin told her that his parole officer was at the door and said "you have your gun on you." (*Id*. at 114, 144.) Esprit went back to the basement, placed the gun on the air hockey table and covered it with clothes, and proceeded back upstairs. (*Id*. at 114, 144, 149.) When the agent asked Esprit the location of the gun, she led him downstairs where he found the weapon. (*Id*. at 115.) At the time the drugs were found in her basement, Esprit had no idea that drugs were in her home. (*Id*.) She never saw drugs in her home, and to her knowledge, none of her children or their friends had any problems with drugs or drug arrests. (*Id*. at 116-17.) Esprit had "zero tolerance on drug use." (*Id*. at 117.) According to Espirt, one could not enter the home through the basement door because "there was always a stick placed up so it couldn't be pushed in." (*Id*. at 118, 143.)

Esprit said that Benjamin would go to auto auctions, purchase cars, fix them up, and sell them. (*Id*. at 125-26.) Esprit testified that she used the nitrile gloves in the kitchen for cleaning the house and cleaning up after the dog. (*Id*. at 128-29.) She did not recognize the Chefmate scale that was found during the search. (*Id*. at 129.) With respect to people who were often in Esprit's basement, the father of Esprit's granddaughter would regularly come over the house to see his child and Esprit's oldest daughter. (*Id*. at 131-133.) The basement had two pool tables and an air hockey table; it was an entertainment hub of the home. (*Id*. at 135.) Esprit's two godsons would also come

over to the house, sometimes with a friend, and play in the basement. (*Id*. at 136-38.) One of Esprit's godsons has gotten into trouble, but she could not explain in detail what that trouble entailed. (*Id*. at 139-40.) The younger children also played in the basement. (*Id*. at 140.) Esprit never witnessed drug activity in the basement. (*Id*. at 155.)

      3.    *Detective James Vinter*

James Vinter, a detective assigned to the Montgomery County District Attorney Office's Narcotic Enforcement Team, testified as an expert for the Government. He opined that the drugs found in the home were consistent with distribution, not personal use. (*Id*. at 170-71.) His opinion about the marijuana was based on the amount seized and the way that it was packaged. (*Id*. at 171-72.) As for the crack, Detective Vinter did not believe that an individual would purchase the 6.62 grams seized in this case for personal use. (*Id*. at 175-76.) He also considered it important that no crack pipe or implement for smoking crack was found in the home. (*Id*. at 177.) The scale could be used to weigh drugs. (*Id*. at 178.) He also testified that individuals on parole often wore nitrile gloves similar to those found in the home and in Benjamin's car for bagging illegal drugs. (*Id*. at 179.) Detective Vinter considered Benjamin's experience with firearms relevant to his opinion because "[d]rug dealers need guns for their protection; protection from other drug dealers, protection from drug users." (*Id*. at 180.) He also pointed to the pit bull as evidence that Benjamin was distributing drugs, as well as the fact that the drugs were hidden in the rafters, and Benjamin's use of an alias. (*Id*. at 181-84.) Detective Vinter testified that he believed the agents uncovered a drug ledger because based on the comments in the ledger, it contained prices and amounts of drugs. (*Id*. at 185-86, 200-01.) Detective Vinter believed, however, that the ledger was not only a drug ledger but was also used to keep track of car parts. (*Id*. at 185-87, 198, 200.)

7

Vinter was allowed to testify that the reference to "150" for a "ball" in the ledger was to an eighth of an ounce of crack or cocaine, which would have cost approximately $150 at the time. (*Id*. at 189-90.) Counsel for Defendant suggested that the reference to a "ball" could have been a ball bearing. (*Id*. at 197.)

## II. STANDARDS OF REVIEW

### A. Rule 29

Rule 29 provides that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed R. Crim. P. 29(c)(2). The court must view the evidence in the light most favorable to the prosecution and must uphold the verdict provided that any rational trier of fact could have found guilt beyond a reasonable doubt given the available evidence. *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005). Defendants face an uphill battle under this "highly deferential standard." *United States v. Carbo*, 572 F.3d 112, 119 (3d Cir. 2009). A challenge to the sufficiency of the evidence supporting a jury verdict "should be confined to cases where the prosecution's failure is clear." *United States v. Smith*, 294 F.3d 473, 477 (3d Cir. 2002) (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1994)).

A court "must be ever vigilant in the context of Federal Rule of Criminal Procedure 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Brodie*, 403 F.3d at 133 (citing *United States v. Jannotti,* 673 F.2d 578, 581 (3d Cir. 1982).

### B. Rule 33

Rule 33(a) of the Federal Rules of Criminal Procedure permits a court to vacate any

judgment and grant a new trial "if the interest of justice so requires." Under a Rule 29 motion, a court does not view the evidence in the light most favorable to the government when considering a Rule 33 motion but rather exercises its own judgment in evaluating the government's case. *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002). Nonetheless, "a district court 'can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred–that is, that an innocent person has been convicted.'" *United States v. Davis*, 397 F.3d 173, 181 (3d Cir. 2005) (quoting *Johnson*, 302 F.3d at 150). Additionally, "motions for new trials are disfavored and are only granted with great caution and at the discretion of the trial court." *United States v. Martinez*, 69 F. App'x 513, 516 (3d Cir. 2003) (citing *United States v. Allen*, 554 F.2d 398, 403 (10th Cir. 1977)). A court must grant a new trial if it concludes that the trial was beset by cumulative errors that so infected the jury's deliberations that they substantially influenced the trial's outcome. *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994).

## III. DISCUSSION

### A. Drugs

Benjamin argues that his drug convictions cannot stand because the Government failed to show that he possessed the drugs found in the basement of Esprit's home on September 19, 2008. He relies heavily on the Third Circuit's decision in *United States v. Brown*, 3 F.3d 673 (3d Cir. 1993).

The fact-intensive inquiry of what evidence suffices to sustain a drug possession conviction warrants a thorough discussion of *Brown*. Rufus Brown and his co-defendant, Ama Baltimore, were

9

both convicted of three counts of possession with intent to distribute controlled substances. The search of Brown's residence was predicated on a warrant that included information from a confidential informant who had observed Brown and several others package and prepare cocaine and heroin for sale. When police searched the residence they detained a man who had tried to flee as well as large quantities of cocaine powder, cocaine base, heroin, and drug paraphernalia. The heroin was found in the refrigerator in the kitchen. Cocaine powder was found in a box in the kitchen closet and throughout the upstairs rear bedroom. Crack was also found in that bedroom as was a coffee grinder, strainers, and a balancing pan, all with cocaine residue. The bedroom closet contained another coffee grinder with cocaine residue. Two respirator masks, commonly used to shield against dust generated by drug preparation were found in a plastic garbage bag in the bedroom. One of the masks had lipstick marks on it, but the lipstick marks were not connected to anybody. The rear bedroom also contained drug packaging materials, and cutting agents.

While the search progressed, detectives outside the house observed Baltimore arrive at the house in a taxi. Baltimore walked up to the house and inserted a key in the door. Before she could enter the house, she was arrested and brought inside. While inside, police showed her a pair of shorts that contained a switchblade; Baltimore admitted to owning both the shorts and the knife. She also stated that she was not subject to arrest "because I am in my own house." 3 F.3d at 675. No drugs were found where Baltimore's switchblade and shorts were uncovered.

The Third Circuit reversed Baltimore's conviction. Upon review of the record, the circumstantial evidence offered to show that Baltimore exercised dominion and control over the drugs and know of their existence was:

(1) Baltimore had a key to the house;

> (2) She arrived at the house during the search and attempted to enter the house using the key;
>
> (3) Baltimore admitted that a pair of shorts and a switchblade that were found in a room in which no drugs were found belonged to her;
>
> (4) She told officers that she could not be arrested because she was in her own house; and
>
> (5) The physical evidence and testimony showed the house was used to store, cut, and package drugs for sale.

*Id*. at 680. Baltimore countered that none of the evidence linked her to the drugs found in the house. She emphasized that her fingerprints were not found on any drugs or drug paraphernalia, although prints of her co-defendant were found; that her belongings were found in a room in which no drugs were found; that she was arrested before she entered the house; and the deed to the house showed that Brown was the sole owner.

The Third Circuit held that "while the evidence may be sufficient to show that Baltimore was residing at the Brown home and that she knew that drugs were in the house, the evidence is not sufficient to support a finding that she exercised dominion and control over the drugs." *Id*. at 681. The court reviewed a number of cases, both within and outside of the Third Circuit, when it concluded that knowledge of drug activity occurring in your house is insufficient to sustain a drug possession charge. As this Court explained in its charge to the jury, "[m]ere proximity to the controlled substance or mere presence on the property where it was located or mere association with the person who does control the controlled substance or the property is not enough to support a finding of possession." (Mar. 9, 2011 Trial Tr. at 51-52.) Rather, "[i]f the defendant knew of the

controlled substances and . . . had the power and intention to exercise control over it . . . you may find that the Government has proved the possession." (*Id*. at 51.) Furthermore, "when drugs are found in a multi-room home . . . the evidence linking the defendant to the drugs arguably must be even stronger." *Brown*, 3 F.3d at 683. In *Brown*, the government had shown only that Baltimore lived at the house, had some control over the house, and knew drugs were in the house.

Defendant also cites *United States v. Jenkins*, 90 F.3d 814 (3d Cir. 1996) because of the Third Circuit's language mandating a "decisive nexus of dominion and control between the defendant and the contraband." In *Jenkins*, the defendant was sitting on a couch next to another man at 1:30 am wearing boxer shorts and a t-shirt when officers rushed into a building based on a call about shots being fired. On a coffee table before Jenkins and his co-defendant was cocaine, two scales, two loaded guns, Ziploc bags, and clear plastic vials. No cutting implements were found nor, was any cocaine residue found on Jenkins or the scales. Jenkins cooperated with the police and did not try to hide the contraband. The Third Circuit held that *Brown* controlled and reversed Jenkins's conviction. "Without other proof of dominion and control, we can only conclude that it was sheer happenstance that Jenkins was seated on the couch next to the cocaine when the police entered the apartment . . . a reasonable jury may not infer dominion and control beyond a reasonable doubt from the defendant's physical distance from the drugs alone." *Id*. at 820.

Benjamin argues that *Brown* warrants either an acquittal or a new trial on the drug possession convictions. He points out that the Government failed to introduce any forensic evidence that linked him to the drugs found in the ceiling of the basement. (Def.'s Mem. of Law in Supp. of Def.'s Mot. for J. of Acquittal or New Trial [Def.'s Mem.] at 9.) He also notes that the area where the drugs were found was used by many persons, including teenagers, who could access the basement without

Esprit's or Benjamin's knowledge. (*Id*.) Benjamin also attacks the Government's argument that the gloves found in the house and Defendant's car, as well as the scale found in the bedroom closet, demonstrate dominion and control over the drugs. (*Id*. at 9-10.) He likens this evidence to the shorts and switchblade uncovered in *Brown*. (*Id*. at 10.) Defendant also tries to exclude the testimony of Detective Vinter as speculation. (*Id*. at 11.)

Contrary to the Government's assertion, this Court concludes that the failure to test any of the seized evidence for fingerprints or drugs was sloppy and potentially damaging to the Government's case. However, the Government submitted evidence sufficient to show Benjamin's dominion and control of the drugs found in the basement. First, and in contrast to the evidence of Baltimore's possession in *Brown*, the drugs were found in a location where Benjamin kept his possessions, namely his stereo equipment. (Mar. 7, 2011 Trial Tr. at 53-54; *see also* Mar. 8, 2011 Trial Tr. at 119.) Agent Gaab watched Benjamin place stereo equipment in vehicles on two different occasions fifteen feet from the basement door. (Mar. 7, 2011 Trial Tr. at 103-04.) The location of the drugs is not dispositive. *See Jenkins*, 90 F.3d at 819 (noting that it is a "serious misreading of [Brown] to conclude that the degree of proximity of Baltimore or her clothing to the drugs was a controlling factor.") However, the drugs were found in a secreted location in the home where Benjamin kept his property. The jury was thus free to consider this fact. *See Jenkins*, 90 F.3d at 818 (evidence that the defendant tried to hide contraband can establish dominion and control). Second, the scale was found in the bedroom shared by Esprit and Benjamin, yet Esprit testified that she did not know of its existence. (Mar. 8, 2011 Trial Tr. at 129.) Third, nitrile gloves were found not only in the home but in a car belonging to Benjamin as well. (Mar. 7, 2011 Trial Tr. at 58, 60.) Fourth, although there was testimony that a number of persons used the basement, some perhaps without

Esprit's knowledge, Esprit testified extensively about both the family members who regularly used the basement as well as their friends. (Mar. 8, 2011 Trial Tr. at 135-41.) She stated that to the best of her knowledge her children did not have problems with drugs and that she had never seen drugs in her home prior to the parole search. (*Id*. at 116-17.) She further noted that she had a zero tolerance policy for drugs and that she made her policy known. (*Id*. at 117-19.) Although that policy was obviously violated, the jury was free to conclude that it was violated by the other adult living in the house, particularly since Esprit offered no testimony that any of the individuals Defendant tried to paint as the possible source of the drugs had any link to those drugs or previous drug histories. To the contrary, she never witnessed any drug activity related to the teenagers regularly in her basement. (*Id*. at 155.)

Defendant also suggests that Benjamin's use of an alias is of no relevance here because he did so to further his activity of buying, repairing, and selling cars, an activity that he could not perform under his real name because he was not permitted to have a driver's license. (Def.'s Mem. at 11.) While that is a plausible theory, at a minimum, "it is common for individuals to be known by an alias in the drug trafficking world." *United States v. Scott*, Crim. A. No. 10-677, 2011 WL 1474187, at *11 n.3 (E.D. Pa. Apr. 15, 2011) (citing *United States v. Zahir*, 242 F. App'x 880 (3d Cir. 2007)). Of course, lying about one's identity does not make one a drug dealer. However, the jury could factor Benjamin's deception into the equation when reaching its verdict. It was not obligated to separate each piece of evidence and agree with Defendant's assessment of the relevance of that evidence. Finally, the purported drug ledger offered the jury another link between the drugs in the basement and Benjamin. Although the Court deemed much of Detective Vinter's testimony as speculative, the jury could believe that the ledger included drug references. As the ledger clearly

belonged to Benjamin, the jury was thus free to infer that Benjamin kept a stash of drugs where he lived. *See United States v. Burton*, 288 F.3d 91, 104 (3d Cir. 2002) (accepting "common sense proposition" that drug dealers often keep evidence of drug transactions at home); *United States v. Whitner*, 219 F.3d 289, 297-98 (3d Cir. 2000) (noting that evidence of drug crimes is likely to be found where dealer resides).

For all of these reasons, the Court concludes that the evidence against Benjamin on the drug possession charges goes beyond mere knowledge of drugs on the premises where he lived. The Government showed a "decisive nexus of dominion and control between the defendant and the contraband" necessary to sustain Benjamin's drug conviction. *See Jenkins*, 90 F.3d at 820. Therefore, the Court will neither grant an acquittal or award a new trial on this issue.

**B.     Guns**

   *1.     Possession*

As outlined in the Court's charge, the felon-in-possession statute required the Government to prove the following: (1) that Benjamin was previously convicted of a felony; (2) that after the conviction, he knowingly possessed the Kel-Tec 9mm handgun; and (3) that his possession was in or affecting interstate or foreign commerce. (Mar. 9, 2011 Trial Tr. at 73-74.) The Court further instructed that the Government was required to prove beyond a reasonable doubt that Benjamin knowingly possessed the Kel-Tec weapon. (*Id*. at 59.) The Court explained the law of possession:

> To possess means to have something within a person's control. The Government does not have to prove that Nathaniel Benjamin physically held the firearm; that is, had actual possession of it. As long as the firearm was within his control, he possessed it.
>
> If you find that Nathaniel Benjamin either had actual possession of the firearm or had the power and the intention to exercise control over it, even though it was not in his

> physical possession – that is, that he had the ability to take actual possession of the object when he wanted to do so – you may find that the government has proven possession. Possession may be momentary or fleeting.
>
> The law also recognizes that possession may be sole or joint. If one person alone possesses a firearm, that is sole possession. However, if more than one person may have the power and intention to exercise control over a firearm, that is called joint possession.
>
> If you find that Nathaniel Benjamin had such power and intention, then he possessed the firearm even if he possessed it jointly with another.
>
> Mere proximity to the firearm or the property where it is located or mere association with the person who does control the firearm or the property is insufficient to support a finding of possession.

(*Id*. at 59-60.) "[C]onstructive possession exists if an individual 'knowingly has both the power and the intention at a given time to exercise dominion or control over a thing, either directly or through another person or persons.'" *United States v. Lopez*, 271 F.3d 472, 487 (3d Cir. 2001) (quoting *United States v. Blackston,* 940 F.2d 877, 883 (3d Cir.1991)). Mere proximity to the firearm is insufficient to support a finding of possession. *See United States v. Godson*, 298 F. App'x 171, 173 (3d Cir. 2008) (citing *Brown*, 3 F.3d at 680).

Defendant contends that the Government failed to prove constructive possession of the firearm on September 19, 2008. (Def.'s Mem. at 14-17.) Defendant notes that Esprit bought the gun, kept it within her reach at all times, and although he used it on September 14, 2008, he did not constructively possess it five days later. (*Id*. at 15.) Defendant also points out that Agent Gaab never saw him with the gun and none of his personal effects were found under the blanket near the gun. (*Id*. at 17.)

The evidence submitted by the Government was sufficient to establish possession of the gun on September 19, 2008. The Government submitted evidence that Benjamin went with Esprit to

purchase the gun because he had experience with firearms, filled out paperwork necessary to use the weapon, fired the identical Kel-Tec weapon with her at a firing range a mere five days before that gun was found in Esprit's house, and the box for the gun was found under his bed.

Clearly, Benjamin had knowledge that the gun was in the home; he made sure that Esprit had the gun on her when Agent Gaab arrived at the door. *See United States v. Webster*, 400 F. App'x 666, 669 (3d Cir. 2010) (finding constructive possession based in part on fact that defendant lived where the gun was found and had unfettered access to the apartment). Furthermore, it is not a stretch for a jury to infer that because Esprit was willing to keep a gun in the home despite her knowledge that Benjamin could not be in the vicinity of gun, Benjamin could access the gun if he so chose. Finally, the case for the gun was found under the bed where Benjamin slept. This evidence goes well beyond mere proximity to the Kel-Tec and is sufficient to sustain the jury's guilty verdict.

2. *Constitutionality*

Defendant argues, to preserve the issue for appeal, that the felon in possession statute is unconstitutional both on its face and as applied. The felon in possession statute is constitutional on its face. *See United States v. Barton*, 633 F.3d 168, 172 (3d Cir. 2011) (felon in possession statute does not violate Second Amendment); *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2011) (felon in possession statute does not violate Commerce Clause). The Court also rejects Benjamin's as-applied challenge to the law's constitutionality because there was testimony that the gun, which was found in Pennsylvania, was made in Florida and thus crossed state lines. *See United States v. Kitsch*, 307 F. Supp. 2d 657, 660 (E.D. Pa. 2004) ("Moreover, the *Singletary* opinion explicitly recognized that the Government, to secure a conviction under § 922(g)(1), need only prove that a firearm once traveled in interstate commerce."). Because the Court rejects Benjamin's constitutional

17

analysis, it also rejects Benjamin's request to arrest judgment on Counts Three and Four of the Indictment under Rule 34 of the Federal Rules of Criminal Procedure.

## C. Evidentiary Errors

The Court rejects Defendant's request for a new trial based on evidentiary errors. First, Defendant argues that the jury impermissibly inferred his guilt from references to his status as a parolee. (Def.'s Mem. at 30-33.) The Court does not agree that the record is "saturated with references to Mr. Benjamin's status as a parolee." (*Id*. at 31.) The Court was careful to direct that references to Defendant's parolee status were kept to a minimum, instructing that Agent Gaab limit his testimony that he was employed as a parole agent and was searching the approved residence of one of his charges. (Mar. 4, 2011 Trial Tr. at 6-7.) But this trial could not have been conducted without the jury hearing that Benjamin was on parole. Furthermore, Benjamin's lawyer referred to Defendant's status, to "state parole agents," that Benjamin "was on state parole at the time," and that agents conducted a parole search. (Mar. 7, 2011 Trial Tr. at 15-17, 20, 63; Mar. 8, 2011 Trial Tr. 146, 148.) Counsel for Defendant also put forth the theory that Benjamin used an alias because he was driving although he did not have a valid license – a violation of Benjamin's parole. (*See* Def.'s Mem. at 11; Mar. 9, 2011 Trial Tr. at 26-27 ("He's fixing these cars up. Now, he doesn't have a license. It's suspended. So, he's not supposed to drive a car, and that may well be a violation of his parole, but again, that's not your issue.").)

Defendant next complains that Detective Vinter's testimony exceeded the bounds of permissible expert testimony. (Def.'s Mem. at 33-34.) Defense counsel noted that the Court sustained many of his objections to the expert's testimony regarding the drug ledger. He is correct; the Court believed that Detective Vinter at times crossed over from providing his opinion to treating

18

the "drug ledger" as a ouija board to arrive at the conclusion he desired. (*See* Mar. 8, 2011 Trial Tr. at 188-89.) The Court agrees that this "expert's" testimony was largely speculation and largely unhelpful to the jury. As a result, the Court, on several occasions, sustained objections to Detective Vinter's conjecture. (Mar. 8, 2011 Trial Tr. at 188-89.) The Court also instructed the jury that based on the sustained objections, they were not to consider the answers as evidence. (*See* Mar. 9, 2011 Trial Tr. at 43.) Nonetheless, government agents may offer testimony regarding the modus operandi of drug traffickers, including the meaning of narcotic code words. *United States v. Gibbs*, 190 F.3d 188, 211 (3d Cir. 1999); *United States v. Theodoropoulos*, 866 F.2d 587, (3d Cir. 1989). Although Defendant disagreed about the import of the ledger and the writing it contained, the jury was free to believe that the notebook found belonged to Benjamin and that the notebook contained a drug reference to a ball, or an eighth of an ounce of cocaine. (Mar. 8, 2011 Trial Tr. at 189-90.)

Finally, the Court finds nothing in the record to warrant altering its decision on Defendant's motion to suppress.

## IV. CONCLUSION

Having considered Benjamin's arguments and having reviewed the record, the Court finds no basis to acquit Benjamin of the gun or drug charges for which he was convicted. The Court also finds no reversible error that would warrant a new trial in this matter. The Court will therefore deny Benjamin's motion for acquittal, a new trial, or to arrest judgment in its entirety. An Order consistent with this Memorandum will be docketed separately.